UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - x
                              :
FRANK C. AMODEI,              :  No. 3:16-cv-01493(SRU)
              Plaintiff,      :  915 Lafayette Boulevard
                              :  Bridgeport, Connecticut
         vs.                  :
                              :
LINDA STRUMPF, ET AL,         :  December 6, 2016
              Defendants.     :
                              :
- - - - - - - - - - - - - - x

                       MOTION HEARING


B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.



A P P E A R A N C E S:

     FOR THE PLAINTIFF:

          LAW OFFICES OF JOANNE FAULKNER
               123 Avon Street
               New Haven, Connecticut  06511-2422
          BY:  JOANNE S. FAULKNER, ESQ.


     FOR THE DEFENDANTS:

          LAW OFFICES OF LINDA STRUMPF
               244 Colonial Road
               New Canaan, Connecticut  06840
          BY:  LINDA STRUMPF, ESQ.



                 Sharon L. Masse, RMR, CRR
                  Official Court Reporter
                  915 Lafayette Boulevard
               Bridgeport, Connecticut  06604
                    Tel: (860)937-4177

1          (Whereupon, the following proceedings commenced

2     at 1:18 p.m.)

3          THE COURT:  Good afternoon.  We're here in the

4     matter of Amodei, I think it's pronounced, vs. Strumpf.

5     Could I have appearances, please.

6          MS. FAULKNER:  Joanne Faulkner for the

7     plaintiff.

8          MS. STRUMPF:  Linda Strumpf for the defendant,

9     pro se, and for the defendant U.S. Equities.

10          THE COURT:  Well, let me maybe just cut to the

11     chase.  I'm in the middle of a trial, and I think I'm just

12     going to try to tell you what I'm thinking about the

13     motion to dismiss.

14          I think there is potential merit to some aspects

15     of the motion to dismiss, but I think that certain of the

16     claims are going to survive based upon my understanding of

17     the complaint, but I think ultimately we probably need a

18     more detailed complaint to be clear about the basis for

19     some of the causes of action.

20          I think that the Rooker-Feldman doctrine is

21     going to bar the relitigation of what happened in small

22     claims, even though that was basically a determination

23     based upon the timeliness of the exemption form.  That

24     still is a ruling entitled to deference under the

25     Rooker-Feldman doctrine.  It seems to me that some of the

1    claims, based upon my understanding of the complaint, some

2    of the claims are seeking to, in effect, relitigate or

3    challenge the correctness of that ruling.  Other of the

4    claims, though, I think are not.  Specifically, the Fair

5    Debt Collection Practices Act claims, the CCPA claims and

6    the abuse of process claims I think are independent even

7    based upon the sparse detail that we have, seem to be

8    independent of the determination in the small claims court

9    and, rather, seem to be addressing issues that are

10   independent of whether the state court was right or wrong

11   in its ruling.  So, for example, the Court may have

12   properly ruled the way it did, but the manner in which the

13   execution was made could be an independent violation even

14   if the execution were properly issued by the state court.

15          So bottom line, I think if my understanding of

16   the complaint is correct, which I think is somewhat in

17   doubt, it looks like the CUTPA, statutory theft,

18   conversion and unjust enrichment claims appear to be based

19   upon a challenge, in effect, to the small claims ruling,

20   whereas the FDCPA and CCPA and abuse of process claims

21   appear to me to be independent.  I think it would be

22   helpful to have a further amended complaint that gave us

23   greater detail about the basis for, for example, if a

24   CUTPA claim was going to be refiled, what is the basis for

25   the CUTPA claim; FDCPA, what is the basis for the FDCPA

1    claim?  I don't have a great sense of that from the
2    current complaint, and much of my understanding comes from
3    the briefing rather than the complaint.

4         So, in short, what I'm inclined to do is dismiss
5    the complaint without prejudice to filing a further
6    amended complaint that clarifies the factual and legal
7    basis for the various claims that would be included in
8    that further amended complaint.  So I don't know how
9    either of you feel about that, if you want to be heard
10   further on the motion.  That's the way I'm leaning.

11        MS. STRUMPF:  Well, the only thing I would like
12   to be heard on is what Your Honor stated was that you
13   believe that the form itself was -- could have been an
14   FDCPA violation, the use of the form; and, I mean, as
15   pointed out in my briefing, the form was for personal
16   property.  That's all that I did, and on behalf of the
17   other defendant, was file a form for a personal property
18   execution.  I then sent it to the marshal, who was
19   supposed to serve it on the judgment debtor, the plaintiff
20   in this case, for his personal property that was
21   nonexempt, which was listed on the form and in the
22   statute.  The form mirrors the statute.  Then the marshal
23   served it on One Call, and One Call was supposed to
24   forward any personal property.  I never --

25        THE COURT:  So is that set forth, all of those

1   facts set forth in the complaint?

2        MS. STRUMPF:  I can't really say that they were

3   or wasn't -- they were or weren't, but what I'm trying to

4   say is that's what I did.

5        THE COURT:  Right, and so you may have a valid

6   defense, but we're here on a motion to dismiss.

7        MS. STRUMPF:  Right, but what I'm saying --

8        THE COURT:  So I'm not taking up the merits.

9   I'm deciding on a motion to dismiss whether there's a

10  valid claim to go forward with discovery.

11       MS. STRUMPF:  Right, I understand that --

12       THE COURT:  Right.

13       MS. STRUMPF:  -- but what I'm trying to say is

14  that all the defendants did was file a personal property

15  claim for defendants -- for the plaintiff's, in this case,

16  personal property, and send it to the marshal.  That's

17  what we did.  There was no personal property --

18       THE COURT:  Am I permitted to look outside the

19  four corners of this document?

20       MS. STRUMPF:  Not for a motion to dismiss.

21       THE COURT:  Right.  So you're asking me to do

22  that.

23       MS. STRUMPF:  Okay, I see what you're saying.

24       THE COURT:  Right.  So on a motion to dismiss,

25  you may eventually prevail on the claims.  I have no idea.

1    Maybe discovery is going to show that even though it was a

2    personal property form, the sheriff is going to say,

3    "Yeah, they told me to serve it on the employer and

4    garnish the wages using this form.  I'm not a lawyer, I

5    just did what they told me to do," in which case maybe

6    there's a claim for the plaintiff.  I have no idea what

7    the merits are going to show, but we're just here to

8    decide whether the case can go forward.  And what I'm

9    suggesting is the arguments made in the motion appear to

10    be arguments that would dismiss some but not all of the

11    claims, but I'm concerned about even dismissing those

12    because I may be misinterpreting the claims because

13    there's not a lot of detail about the basis.  A CUTPA

14    claim, I can imagine an allegation that would survive a --

15    a CUTPA claim would survive the Rooker-Feldman issue, much

16    as the abuse of process claim appears to me to survive it.

17    We don't have that right now, or at least it's not clear

18    that we have that, so that's why I think a more detailed

19    complaint would allow us to understand which claims are

20    valid at the motion to dismiss stage and therefore subject

21    to some discovery.  I think I'm going to continue the stay

22    on the discovery until we get another complaint so we know

23    what we're really discovering, because right now it's a

24    little bit unclear.

25                    MS. FAULKNER:  Your Honor, the problem is, all

1    I've asked for in discovery is the paperwork, and I think

2    I need that paperwork in order to do a valid revised

3    complaint because there are a number of things I don't

4    know.

5              THE COURT:  When you say "the paperwork," you

6    mean what?

7              MS. FAULKNER:  I asked in my discovery, I just

8    asked for all the communications, paperwork with regard to

9    this plaintiff and the execution during 2016.  It's one --

10   it's a single production.

11             MS. STRUMPF:  Well, I --

12             MS. FAULKNER:  And I really think I need that in

13   order to flesh out the complaint because that's stuff that

14   I don't have and I don't know.

15             MS. STRUMPF:  Everything in the small claims

16   docket is on the small claims record, is in the small

17   claims court, it's all public record, so that's the first

18   thing.  The second thing is, if the claim is going to be

19   dismissed without prejudice, I can't see how discovery can

20   continue.  Then defendants serve another complaint.

21   Then -- excuse me, the plaintiff serves another complaint.

22   Then defendant in here makes another motion to dismiss or

23   puts an answer in, in which case the discovery should

24   proceed.

25             THE COURT:  Well, okay, we can do it any number

1    of ways.  There's some claims that are going to survive.

2    I'm not dismissing FDCPA, CCPA or abuse of process.  So

3    why shouldn't the fundamental communications be turned

4    over?

5              MS. STRUMPF:  Well, I mean, it's all in the

6    small claims record.  If the Court wants, I have the small

7    claims record.

8              THE COURT:  I don't hear Ms. Faulkner asking for

9    the small claims record.  I hear her asking for, in

10   effect, the debt collection efforts regarding her client.

11             MS. STRUMPF:  There were no debt collection

12   efforts other than what's in the small claims record.  A

13   judgment was obtained, a property execution was served,

14   that's it, that's all that was done, just like it says on

15   the record.  There was no letter sent.

16             THE COURT:  So it couldn't be easier to send her

17   the appropriate documents over.  It's probably three

18   pages.

19             MS. STRUMPF:  Well, I can -- I can make a copy

20   of the small claims record, which is in Hartford, and send

21   it over.

22             THE COURT:  What about your letter to the

23   sheriff?  What about your notes to the sheriff?  What

24   about any communications you had with the employer?  What

25   about --

1          MS. STRUMPF:  I had no communications with the

2    employer.  I sent it over to the sheriff; that's it.  When

3    you send the personal property execution over to the

4    sheriff, they're supposed to know what to do.

5          THE COURT:  So there's no cover letter?

6          MS. STRUMPF:  I'm sure I had a cover letter --

7          THE COURT:  Okay.

8          MS. STRUMPF:  -- but did I keep the cover

9    letter?  I don't know.

10          THE COURT:  Well, okay.  How difficult is it to

11   find the cover letter and send it over?

12          MS. STRUMPF:  If I have it, I will.

13          THE COURT:  Right.

14          MS. STRUMPF:  Is that what the Court is asking

15   me to do?

16          THE COURT:  Yes.  I mean, it seems to me if it's

17   a minimal amount of discovery, we have some claims that

18   are going to proceed, it's -- let me just talk very

19   frankly.  FDCPA has a fee-shifting provision.  The way

20   defendants shoot themselves in the foot on these kind of

21   cases is to make a lot of trouble.  The more motions, the

22   more discovery disputes, the more problems, the more hours

23   are being charged by plaintiff's counsel, and the larger

24   is the claim at the end of the day.  These cases can be

25   settled right at the very beginning because the attorney's

1    fees are not there yet, and the more there's fight, fight,

2    fight, Ms. Faulkner, she would probably deny this, but

3    she's laughing all the way to the bank because

4    99.9 percent of these cases eventually settle, and they

5    settle against the attorney's fees that are going to be

6    charged over time.

7         MS. STRUMPF:  Can I speak frankly to that, Your

8    Honor --

9         THE COURT:  Sure.

10        MS. STRUMPF:  -- since you spoke frankly?

11        THE COURT:  Sure.

12        MS. STRUMPF:  This particular plaintiff's

13   attorney makes settlement demands at the very beginning,

14   after the complaint was served, before the amended

15   complaint was served, that are so unreasonable, so

16   ridiculous that there's no way that we can settle this.

17   I'm obviously a debt collection attorney, I'm familiar

18   with the FDCPA, I'm not an FDCPA attorney, I certainly

19   know what Your Honor is talking about, but I'm dealing in

20   a situation where my back is against the wall here --

21        THE COURT:  But --

22        MS. STRUMPF:  -- where there is no possible

23   way --

24        THE COURT:  Is it going to be better or worse

25   for you 50 attorney hours later?

1              MS. STRUMPF:  You know, it's got to be better,

2    it's got to be better in the end because I can't --

3    there's no -- there's no settlement here.  There's no

4    reason -- there's no reasonable discussion.  There's no

5    reasonable --

6              THE COURT:  Did you counter?  Did you counter?

7    Did you make an offer?

8              MS. STRUMPF:  There's no counter.

9              THE COURT:  Did you make an offer?

10             MS. STRUMPF:  This is not my first case with

11   this plaintiff's attorney.

12             THE COURT:  Fair enough.  It's not my first

13   case --

14             MS. STRUMPF:  I did make an offer, but there is

15   no counter.

16             THE COURT:  So you didn't counter?

17             MS. STRUMPF:  I could counter, but, you know,

18   it's not going to be accepted.  I've countered before and

19   I've been told before, No counter, this is it, take it or

20   leave it.

21             THE COURT:  Okay.

22             MS. STRUMPF:  So there's no counter.

23             THE COURT:  Well, okay.  You're assuming that

24   what happened last time is what's going to happen this

25   time.

1           MS. STRUMPF:  Well, it happened more than once.

2           THE COURT:  Okay.

3           MS. STRUMPF:  It happened more than once.  I

4    have no reason to --

5           THE COURT:  Did the demand go down over time in

6    those other cases?

7           MS. STRUMPF:  No, up.

8           THE COURT:  Thank you.  That's my point.  Do you

9    think you're going to be better off six months from now

10   than you are today?

11          MS. STRUMPF:  I have -- if I can be frank with

12   the Court, since the Court was frank with me.  If I felt

13   that there was a violation, if I felt there was even -- I

14   understand what Your Honor is saying, but I'm telling you

15   how I feel, and, you know, I know a little bit about the

16   FDCPA.  If I felt that I committed a violation or my

17   client committed a violation, then, yes, I would hold my

18   hands up and settle.  The problem is, I understand what

19   Your Honor is saying, but all I did was serve a personal

20   property execution.  It wasn't -- if it was earnings, then

21   the marshal shouldn't have collected it, and One Call,

22   whatever it is, Call One shouldn't have paid it.  I didn't

23   have any communication with Call One, and I had no

24   communication with the marshal.

25          THE COURT:  Did you return the money that was

1   obtained as a result of the execution?

2          MS. STRUMPF:  I didn't return it because there

3   was a motion -- let me just say one more thing, it was a

4   personal property execution.

5          THE COURT:  Right.

6          MS. STRUMPF:  What the plaintiff did was file an

7   exemption, thousand dollar exemption.  That was based on

8   the personal property.

9          THE COURT:  Okay.

10          MS. STRUMPF:  The Court denied it.

11          THE COURT:  Let me just give you a little

12   analogy.  Let's say I go to the bank and I cash a check

13   for $50, and they give me $450, and I walk out of the bank

14   and I realize, Oh, wow, I cashed a check for $50 and they

15   gave me $450.  What do I do?  I'm going to walk back in

16   the bank and say, Hey, you know what, there was some error

17   here, here's your $400 back, you know?  I don't want to

18   take advantage of a mistake that was made.

19          So I'm just saying is it possible for you to

20   have done nothing wrong -- I did nothing wrong, I just

21   cashed a check for fifty bucks -- and lose this case to a

22   jury?  Absolutely.  Absolutely.  Why?  You haven't turned

23   the money back over.  If you're really taking the position

24   that this was a personal property exemption, you did

25   nothing wrong, you shouldn't keep the money.

1          MS. STRUMPF:  But the -- but the plaintiff made

2    an exemption --

3          THE COURT:  No buts.  No buts.  You kept the

4    money.  How do you think a jury is going to look at that?

5          MS. STRUMPF:  Per court order.

6          THE COURT:  No, no, no, no, no.  If you have a

7    personal property exemption that is treated by the sheriff

8    and the employer as a wage garnishment, basically, you

9    don't take the money.  If the bank makes an error and puts

10   an extra thousand dollars in your account, you don't keep

11   the money.

12         MS. STRUMPF:  I don't know -- I don't know that.

13   All I know is I got the check.  I didn't know it was a

14   wage garnishment.

15         THE COURT:  You just told me it was property.

16   You know it's not property.

17         MS. STRUMPF:  I filed for personal property.  I

18   don't know that it was from wages.  I don't know what it

19   was from.  All I did was receive the check.

20         THE COURT:  Are you standing here really telling

21   me you don't know that this was mistakenly sent to you,

22   this money should not have been sent to you?  You don't

23   even know?

24         MS. STRUMPF:  It was -- I filed a personal

25   property execution.  I served it on -- I gave it to the

1    marshal, who served it on One Call.  One Call is telling

2    me it's a personal property.  I mean, I had no

3    communication with One Call.  I didn't tell One Call, This

4    is wages, you don't have to send it.  It says in the form

5    don't give us wages.  It says that.  I had no

6    communication --

7            THE COURT:  When I gave the bank my $50 check,

8    it said $50, but they gave me 450.  It wasn't my lucky

9    day.  It was time for me to turn around and give the money

10   back.  If you and Ms. Faulkner cannot figure out in the

11   next ten minutes whether One Call improperly sent you

12   money, and if you don't return that money, you're just

13   strengthening the argument that she's got valid claims

14   here.

15           MS. STRUMPF:  Well, so Your Honor is saying that

16   if she shows me that it is wages as opposed to personal

17   property, I should return the money, even though I have a

18   court order saying I can keep it?  Is that what the Court

19   is telling me?

20           THE COURT:  I'm just saying you have a court

21   order that says even though it was improper for you to

22   receive the money, you can keep it?

23           MS. STRUMPF:  The court order doesn't say that.

24           THE COURT:  No, it doesn't.  That's my point.

25   That's why she has an abuse of process claim.  That's why

1   she has an FDCPA claim.  What you have is an order that

2   says you can go get money from personal property.  If you

3   got money from some other source, legitimately or by

4   accident, we're here.  You can run up as big a bill as you

5   want to pay her, and then we can go to trial, or you can

6   try to work it out.  You should work it out.  If you got

7   the money by accident, it's no skin off your nose.  You

8   don't need that money.  Send it back.  You don't need this

9   lawsuit, that's for sure.

10           MS. STRUMPF:  I certainly don't need this

11  lawsuit.

12           THE COURT:  Right.

13           MS. STRUMPF:  But, Your Honor, the motion for

14  exemption was in August.  Two weeks later Ms. Faulkner

15  files the complaint.  Nobody contacts me.  Nobody says

16  anything.

17           THE COURT:  You're both right here.  Do you need

18  a few minutes to talk to each other?

19           MS. STRUMPF:  I don't know that it would help to

20  talk to her.  But what you're saying is -- nobody -- the

21  defendant, even after -- the plaintiff, I'm sorry, the

22  judgment debtor didn't say the money was from his wages at

23  the motion for exemption; he just said it was under a

24  thousand dollars, that's all he said, and that he wanted

25  his money back because under Connecticut law, as Your

1    Honor knows, if it's under a thousand and you've made the

2    motion for exemption, you return the thousand.  He made

3    the motion later when he took the records that I had.  So

4    I brought that up to the Court, and the Court said, yes,

5    he made the motion and it was denied.  But he didn't say

6    then, now or ever that it was wages, other than alleging

7    it in the complaint.  He also alleged a lot of other

8    things in the complaint that were untrue, like I spoke to

9    the defendant, which I never did -- or the plaintiff, and

10   I told the plaintiff this.  You know, there was stuff in

11   the complaint, whether it's accepted as true or not, I

12   know it's not true, that I contacted One Call, which I

13   didn't do.  So how am I supposeded to know, other than the

14   fact that she's alleging it, that it's actually earnings?

15          THE COURT:  You might want to talk to

16   plaintiff's counsel.  You might want to call One Call.

17   What did you send me?  Did you send me wages or did he

18   have an expensive piece of equipment that you sold on eBay

19   and gave me the proceeds?

20          I'm trying to save you from yourself; I am.

21   We've been here a half an hour.  That means it's probably

22   another $150 on the bill, maybe $200 on the bill.  We can

23   be here many more times.  You can have discovery.  I'll

24   hear you anytime you want a discovery dispute.  You can

25   run this bill up against yourself as long as you want --

```
 1              MS. STRUMPF:  Your Honor --

 2              THE COURT:  -- or you can try to resolve it.

 3              MS. STRUMPF:  What I would ask then, I doubt if

 4    it's going to work, but maybe we could have a settlement

 5    conference before a magistrate or something like that.

 6              THE COURT:  Well, that's the problem.  Judge

 7    Garfinkel, with whom I'm paired, is scheduling four, five,

 8    six months out.  I've got a parajudicial officer.  I'm

 9    happy to send you to see him.  You've got to talk to each

10    other.  That's the way it is.  You don't have to like each

11    other, but in this lawsuit either to resolve it or to

12    litigate it, you have to be able to talk to each other.

13              MS. STRUMPF:  Your Honor --

14              THE COURT:  You have to.

15              MS. STRUMPF:  Your Honor, I know what you're

16    saying, and obviously I'll take your advice, but I have

17    other FDCPA cases with other attorneys that I'm able to

18    settle.  This attorney is -- the original demand she made

19    was a ridiculous -- was unreasonable.

20              THE COURT:  Okay.  Explain to her why it's

21    unreasonable.  Figure out if you got the money improperly.

22    If you did, I would suggest you send it back.  Then you

23    say, Look, you've got a thousand dollars statutory damages

24    and what are your attorney's fees to date?  Let's split

25    the baby and walk away from this.  Do you really think
```

1    Ms. Faulkner wants to be here any more than you do?  I

2    doubt it.  She probably -- she hasn't said so, but my

3    guess is she thinks of you what you think of her, so --

4              MS. STRUMPF:  She thinks I'm a victim, and in my

5    opinion she uses that.  She's told me on many occasions.

6              THE COURT:  Okay, whatever.  All right.  I can't

7    say it any more bluntly --

8              MS. STRUMPF:  I understand.

9              THE COURT:  -- than what I've tried to say.

10             MS. STRUMPF:  I understand.

11             THE COURT:  I think what we ought to do is spend

12   just a couple minutes seeing if we can resolve this case.

13   What's the demand?

14             MS. FAULKNER:  The demand?  Well, I've got about

15   $12,000 in attorney's fees right now.

16             THE COURT:  Okay.  So the demand is what?

17             MS. FAULKNER:  So the demand is 20,000.

18             MS. STRUMPF:  Plus she asked for return of the

19   money, and I have two cases with this defendant, and she

20   asked me to dismiss both cases, two judgments.  She wanted

21   me to dismiss both judgments.

22             THE COURT:  All right.

23             MS. STRUMPF:  After the service of the

24   complaint, she wanted $10,000 plus return of the money.

25             THE COURT:  All right.  When did you ever settle

1  a case without countering?  What are you willing to pay

2  today to make this case go away?

3           MS. STRUMPF:  Well, I'll return the money, which

4  is 500 some-odd dollars, a thousand dollars for the

5  violation, and I mean --

6           THE COURT:  Half the attorney's fees.

7           MS. STRUMPF:  She wants $20,000 in attorney's

8  fees.

9           THE COURT:  No, she said twelve.  Return the

10  money, plus $7,000.  A thousand statutory and six thousand

11  attorney's fees.

12           MS. FAULKNER:  He lost his job over this, Your

13  Honor.

14           MS. STRUMPF:  She already sued One Call and the

15  marshals, and I had nothing to do with it.

16           THE COURT:  Okay, yes, but that was going to be

17  my point.  That may be a different claim, but it's not a

18  claim against --

19           MS. FAULKNER:  It's because of the execution

20  that he lost his job.

21           THE COURT:  Right, but if the execution was

22  properly -- I mean, I have to assume the execution was

23  properly issued.  It's a judgment of the state court; it's

24  there.

25           MS. FAULKNER:  It was issued properly, yes.  But

1    after that, nothing was right.

2            THE COURT:  Okay, but it does say on it that

3    it's a property execution.

4            MS. FAULKNER:  Right.

5            THE COURT:  So why is that not the employer's

6    problem rather than the lawyer's problem?

7            MS. FAULKNER:  Well, that depends on why she

8    decided to issue a property execution against One Call in

9    Jacksonville, Florida, when my client lives in

10   Connecticut.  Does she think One Call in Jacksonville,

11   Florida has his antique car, his artworks, his jewelry?

12   Why did she issue any kind of execution at all against One

13   Call?  What did she know when she did that?  She had to

14   know it was earnings.

15           MS. STRUMPF:  If I knew -- Your Honor, since

16   we're being frank, if I knew it was earnings, I would have

17   issued a wage execution and gotten more money because it's

18   25 percent of the person's wages in perpetuity.  It

19   doesn't last for four months.  I thought that they had

20   property belonging to him, personal property, whatever --

21   you know.  I mean, that's what I issued.  If it was

22   earnings, they should -- and up until this whole thing

23   started, how am I supposed to know they were earnings?  I

24   understand what Your Honor is saying now, okay, if it's

25   earnings, even though the Court issued an order and

1    permitted you to keep them, and I have no notification, no

2    way to know that it was earnings, you're saying return it

3    anyway.  Okay, so that's what the Court is telling me to

4    do, so I'll listen to the Court.  But how could I possibly

5    know it was earnings up until she filed a complaint saying

6    it was earnings?  I mean, nobody -- obviously she never

7    contacted me before filing the complaint, not once to say,

8    You know, I understand the loss that my client, the

9    plaintiff, lost the wage exempt -- lost the property

10   exemption, which why file a property exemption if it was

11   earnings?  If he thought it was earnings, why didn't he

12   make a motion that it was the wrong form?  But, okay, he

13   filed the property exemption.  It was under a thousand

14   dollars.  Return the thousand dollars.  It was really

15   earnings even though you filed the property exemption.

16            THE COURT:  Yes.  I just --

17            MS. STRUMPF:  In other words, it's a different

18   procedure for earnings, and I certainly would have used it

19   if I thought it was earnings, I didn't, and if One Call

20   returned it.  I didn't have any contact with One Call.

21   And if One Call returned it and said, Listen, these are

22   not earnings, that would have been the end of that.  I

23   mean, I would have no way to know.  The Court is telling

24   me, Okay, Ms. Faulkner, show Linda Strumpf that it's

25   earnings, and then she'll return it.  That's what the

1    Court is saying.  Okay, fine.  And then the Court is

2    saying, Okay, so pay us $6,000 in attorney's fees.  Okay,

3    fine.  All right?  I'll return the money, okay, but I mean

4    I am not -- what if I served a wage execution and he lost

5    his job?  It would be the same thing, that I served an

6    execution.  Does it matter?

7             THE COURT:  Well, I don't think losing the job

8    is really -- it's not damages that are compensable under

9    any of these causes of action.

10            MS. FAULKNER:  I'm afraid I don't see why not,

11   Your Honor, because this execution was the very cause of

12   losing the job, this improper execution.

13            THE COURT:  No, she didn't fire him.  His

14   employer fired him.

15            MS. FAULKNER:  But she served the execution.

16            THE COURT:  Yes, but -- well, okay.  That's like

17   saying the Toyota salesman, who sold the Toyota to the

18   person who hit me coming out of the Toyota lot, is

19   responsible for the automobile accident.  There's a break

20   in the chain of causation.  The employer, if the plaintiff

21   is to be believed, improperly -- you can't terminate

22   somebody because you get an execution.  You're not

23   permitted to terminate people.

24            MS. FAULKNER:  That's right.  It's against the

25   law.

1        THE COURT:  Right, so it's the employer that did

2    the wrong.  Whether the execution is valid, invalid

3    doesn't matter; they can't do it.  But you can't shoot the

4    messenger.  She has a right to attempt to collect a debt.

5    Whether it was done properly or improperly is a different

6    question.  The attempt to collect the debt didn't cause

7    him to lose the job; the employer's improper reaction,

8    assuming the plaintiff is right.  I mean, none of these

9    causes of action give you that kind of consequential

10    damages, which is really what you're talking about.  Had

11    he not lost his job, he would have invested in Apple

12    stock, which went up 400 percent in a week, and so he

13    would have made $30,000.  Well, you can't do that.  It's

14    too remote.  This is too remote.  It's not related to the

15    causes of action you've got against this attorney, too

16    consequential, not compensatory, so you're not going to

17    win that one.  I think you both should walk away.  You

18    obviously don't like each other, and you should just be

19    done with each other.

20        MS. STRUMPF:  I'll agree with what the Court

21    says.  If she shows me they were wages, I'll return it,

22    I'll pay $7,000 and still keep my judgments, which

23    obviously I filed a partial satisfaction and I'll withdraw

24    it.

25        THE COURT:  Let's get this done.

1          MS. FAULKNER:  Your Honor, there is no doubt

2    that this is not personal property.

3          THE COURT:  I understand that, but --

4          MS. FAULKNER:  And what does she want me to do?

5          THE COURT:  The execution says --

6          MS. FAULKNER:  The One Call --

7          THE COURT:  The execution says it's a property

8    exemption, right?  That says nothing about wages.  If they

9    sent wages, they violated the terms of the form.  It's

10   right there.

11         MS. FAULKNER:  And it's less than a thousand

12   dollars, so it's exempt no matter what.  Whether it's

13   wages or property, it's less than a thousand dollars, so

14   it's exempt.

15         MS. STRUMPF:  You have to make a motion for an

16   exemption under the law.  It's not automatic.

17         THE COURT:  Yes.  So I think you've got more

18   claims against One Call than you've got against the

19   lawyer.  You don't want to run up a big fee and then get

20   zero.  Your client presumably wants the money back, plus a

21   thousand dollars statutory damages.  This is the time to

22   get this done.  Fifty percent of your fees is pretty good.

23   It's guaranteed.

24         MS. FAULKNER:  What proof does she want?

25         MS. STRUMPF:  Well, you're saying they're wages.

 1   I mean, do you have a W-2 or something to show they're

 2   wages or whatever?

 3              MS. FAULKNER:  The W-2 hasn't come out for this

 4   year.

 5              THE COURT:  Well, look.

 6              MS. FAULKNER:  Did you look at the attachment to

 7   the complaint?

 8              THE COURT:  You know what?  We're talking

 9   about -- we're talking about settling the claim.  I mean,

10   it sounds like wages.  I don't know what One Call does,

11   but who has personal property at their employer, really?

12   I mean, right?

13              MS. STRUMPF:  So the Court is saying take her

14   word for it that they're wages.

15              THE COURT:  Well, I'm saying settle the case.

16              MS. STRUMPF:  Well, I made my offer.  I mean --

17              THE COURT:  Your offer was?

18              MS. STRUMPF:  I made the offer the Court

19   suggested.

20              THE COURT:  Right, return the money.

21              MS. STRUMPF:  Right.

22              THE COURT:  Pay a thousand dollars statutory

23   damages and six thousand attorney's fees.

24              MS. STRUMPF:  Right, and then I have to file the

25   thing with the Court taking back the partial

1   satisfaction --

2           THE COURT:  That's fine.

3           MS. STRUMPF:  -- and the two judgments stand.

4           THE COURT:  All right, that's the offer.  What's

5   wrong with the offer?

6           MS. FAULKNER:  What's wrong with the offer is we

7   get a thousand dollars against each defendant; that's one.

8   Number two, we are relying on that satisfaction of

9   judgment.  If she says it's undone, that's a different

10  question --

11          MS. STRUMPF:  But I'm returning the money.

12          THE COURT:  In other words, if she's going to

13  return the money, then she's going to take away the

14  partial satisfaction that reflects the money.  You can't

15  get the money back and then get credit for the money, too.

16          MS. FAULKNER:  For conversion?  Treble damages

17  for conversion?

18          THE COURT:  Conversion is not a claim that looks

19  to me like it's going to survive here.  So conversion says

20  the execution was invalid.

21          MS. FAULKNER:  No, conversion says the money was

22  wrongfully taken, withheld, retained -- excuse me, the

23  money was wrongfully retained.

24          THE COURT:  But she doesn't know standing here

25  today that the money has been wrongfully retained.

1           MS. FAULKNER:  Oh, good.  Well, we'll have to

2   go -- we'll have to go do a deposition of One Call, and

3   we'll find out.

4           MS. STRUMPF:  But even if One Call says it now,

5   I have nothing to show it.

6           THE COURT:  Are we really going to let this case

7   go forward?  Really?  Are you declining the offer that's

8   been made?

9           MS. FAULKNER:  Yes.

10          THE COURT:  Okay.

11          MS. FAULKNER:  I think a better offer, a

12  different offer after discussion should be made.

13          THE COURT:  Such as?

14          MS. FAULKNER:  $20,000 to cover everything.

15          THE COURT:  Well, that's not realistically going

16  to happen, so -- okay, well, I tried.  So I'm going to --

17  I'm going to grant the motion without prejudice to filing

18  a further amended complaint within the next 21 days.

19          MS. FAULKNER:  And may I have the discovery,

20  please?

21          THE COURT:  Let's see what's in the amended

22  complaint, and we'll take up the question of discovery

23  when we see valid claims.

24          MS. FAULKNER:  And scheduling order?

25          THE COURT:  Six months from the start of

1   discovery to complete discovery.

2           MS. STRUMPF:  If the plaintiff changes his mind,

3   since the Court asked me to make that offer, the offer

4   still stands, if plaintiff should discuss it --

5   plaintiff's attorney should want to discuss it with her

6   client.

7           THE COURT:  Okay.

8           MS. STRUMPF:  I just wanted to make that.

9           THE COURT:  All right.  Thank you.

10          MS. STRUMPF:  I'm not going to withdraw it.

11          THE COURT:  Okay.  All right, thank you.  Well,

12  good luck, and if you want a referral to a parajudicial

13  officer, let me know.

14          MS. STRUMPF:  Thank you very much for your time,

15  Your Honor.

16          THE COURT:  Thank you.  We'll stand in recess.

17          (Whereupon, the above proceedings adjourned at

18  1:52 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Sharon L. Masse, RMR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

December 27, 2016

/S/ Sharon L. Masse
Sharon L. Masse, RMR, CRR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut  06604
Tel: (860)937-4177